```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4    MASSACHUSETTS INSTITUTE OF      )
      TECHNOLOGY, and ETHANOL BOOSTING)
 5    SYSTEMS, LLC,                   )
                                      )
 6                  Plaintiffs,       )
                                      ) C.A. No. 19-cv-196-CFC
 7    v.                              )
                                      ) JURY TRIAL DEMANDED
 8    FORD MOTOR COMPANY,             )
                                      )
 9                  Defendant.        )

10
                                      J. Caleb Boggs Courthouse
11                                    844 North King Street
                                      Wilmington, Delaware
12
                                      Wednesday, September 18, 2019
13                                    1:30 p.m.
                                      Discovery Dispute
14                                    Teleconference

15
      BEFORE:  THE HONORABLE SHERRY R. FALLON
16             United States District Court Magistrate Judge

17    APPEARANCES:

18            FARNAN LLP
              BY:  BRIAN E. FARNAN, ESQUIRE
19
                      -and-
20
              SUSMAN GODFREY L.L.P.
21            BY:  WILLIAM D. O'CONNELL, ESQUIRE
              BY:  ANDRES C. HEALY, ESQUIRE
22
                                      For the Plaintiffs
23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2             MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  RODGER D. SMITH, II, ESQUIRE
 3
                         -and-
 4
               ALSTON & BIRD
 5             BY:  ANDREW LIGOTTI, ESQUIRE
               BY:  NATALIE C. CLAYTON, ESQUIRE
 6
                              For the Defendant
 7

 8                  ***  PROCEEDINGS  ***

 9             THE COURT:  All right.  Good afternoon,

10    everybody.  It's Magistrate Judge Sherry Fallon, and I'm

11    ready to proceed in Ethanol Boosting Systems, et al versus

12    Ford Motor Company.  We have a number of issues to address

13    in a discovery dispute.  We'll start with the appearances of

14    counsel.

15             Who's with you, Mr. Farnan?

16             MR. FARNAN:  Good afternoon, Your Honor.  Andres

17    Healy and William O'Connell of Susman Godfrey.

18             THE COURT:  Okay.  Thank you.

19             And for the defendant, Ford?

20             MR. SMITH:  Good afternoon, Your Honor.  Rodger

21    Smith at Morris Nichols, along with Natalie Clayton and Andy

22    Ligotti from Alston & Bird.

23             THE COURT:  All right then.  Since I received

24    the moving submission from the plaintiffs first at Docket

25    Item Number 54, we'll start with the plaintiffs' issues.
```

1    Four have been outlined in the submission.  And I did get

2    the letter, by the way, yesterday about the inadvertent

3    attachment as exhibits of certain exhibits that were

4    privileged and clawed back.  So I received that as well.

5              Let's begin.  I'll turn it over to the

6    plaintiffs.

7              MR. O'CONNELL:  Thank you, Your Honor.  This is

8    Bill O'Connell at Susman Godfrey.  I'll be addressing the

9    affirmative issues raised by Pontiac today.

10             THE COURT:  Okay.  Very good.

11             MR. O'CONNELL:  To begin, Your Honor, there are

12   four issues as Your Honor saw in our letters.  First, Ford

13   is refusing to run search terms for eight of the ten

14   document custodians that it selected in this case.  And we

15   urge this Court to require them to use search terms in

16   negotiation with us, and also to provide term-specific hit

17   counts for all its custodians.

18             The second issue I'll be addressing is that Ford

19   must produce the documents about its copy with pride

20   program, including documents from Mr. Hau Thai-Tang.

21             The third issue is that Ford must produce a

22   manifest for the source code that relates to the fuel

23   management system in the accused product.  And in the source

24   code that it's now agreeing to provide relating to the PFDIM

25   F_HLD program, also include any program that interacts with

1    the modules so that we don't come to Your Honor with a

2    similar dispute one month down the line.

3              And fourth, Ford must produce the missing

4    technical documents that plaintiffs identified, including

5    those relating to governmental testing which are all

6    identified in Paragraph 9 of the affidavit of Richard Davis

7    which is Exhibit C to our opening submission.

8              And we'd ask the Court to order the production

9    of these materials by September 25th.

10             On the first issue of ESI searches, Your Honor,

11   Ford needs to be ordered to engage in a collection and

12   review process that involves search terms that are

13   negotiated with plaintiffs for determining eight custodians.

14   In this case, what Ford did is exactly what a party should

15   not do to collect responsive ESI.

16             It had the custodians themselves review the

17   documents and select those documents that it believed to be

18   relevant.  That method is deficient for obvious reasons,

19   including both because it invites mistakes and significantly

20   increases the chances that a custodian may not disclose a

21   particularly damaging document to Ford's case.

22             Letting these custodians judge what is relevant

23   or not relevant is really letting the fox guard the

24   henhouse.  There is also no reason to have the custodians

25   themselves decide what's relevant.

1           It's standard practice, on a large scale case

2    like this that involves ESI, to run search terms.  And

3    Ford's refusal to run those search terms really serves no

4    purpose other than hiding responsive documents.

5           But Your Honor, much of an issue of a custodian

6    possibly withholding the damaging documents, it's also one

7    of practicality.  Even the most informed, even the most

8    well-intentioned custodians simply can't go through six

9    years of emails and electronic documents and correctly

10   identify the responsive ones without running search terms.

11          Moreover, these are documents that are held by

12   witnesses who are not trivial to this case.  These are eight

13   of the ten custodians that Ford itself selected as being

14   relevant to the litigation.  The issue with that is the

15   trusted key witnesses whose job prospects are tied to this

16   technology to review their own documents and disclose both

17   the good and the bad without the use of search terms is

18   simply inviting significant mistakes.

19          The process also lacks significant checks and

20   balances.  We don't know anything about how Ford's

21   custodians are identified which are responsive.  The extent

22   of our knowledge is that counsel talked to the custodians

23   before they were left on their own to decide what was

24   relevant and then send over documents that they believe to

25   be relevant over a six-year period.  It's not a coherent or

1    legitimate way to collect ESI, and it's certainly not what

2    plaintiffs did in this case.

3              Plaintiffs have been running ESI searches for

4    all of their custodians.  And to turn the argument on its

5    head for a moment, if plaintiffs had not run search terms,

6    we fully expect that Ford would be in front of Your Honor

7    right now arguing vociferously that we have to use search

8    terms.  Because Ford didn't run these terms and doesn't know

9    what its custodians did, it won't be able to answer

10   questions about basic questions such as:  Did the custodians

11   retrieve all documents relating to EBS?  To the patent?  To

12   the relevant source code programs?  And doesn't know whether

13   or not its custodians held documents back, either, because

14   they wrongly thought that they were irrelevant or thought

15   that the custodian, him or herself, would be in hot water

16   for disclosing the documents.

17             Just two closing words briefly, Your Honor,

18   about proof and burden.  This is not a case where we're

19   speculating that there are undisclosed documents that are

20   out there as a result of the failure to run search terms.

21   We know that Ford's custodians didn't produce relevant

22   documents, not only because of technical holes in the

23   production, which we'll get to later, but because Ford has

24   produced incomplete documents and a chain showing that

25   Ford's inventors or Ford's employees have been talking for

1    years about EBS IP.

2           And on that point, just looking to the

3    submission we sent yesterday, including the redacted

4    documents and the replacement document after Ford clawed

5    back these documents, that there are documents in their

6    submission yesterday admitting that there were discussions

7    in '14 and '15 at Ford about EBS' patents.  That's Exhibit A

8    to our letter of yesterday.

9           And then Ford's EBS 156809, Exhibit B to our

10   submission yesterday in which, and I'm quoting the document,

11   it said that Ford was "investigating existing IP in relation

12   to its PFDI technology."  And the IP reference in

13   parentheses after that is EBS.

14          The reality is that these documents are likely

15   just the tip of the iceberg, and that Ford's refusal to run

16   terms is likely going to conceal not only the key technical

17   documents, the documents that relate directly to plaintiffs,

18   to Ford's willful infringement of plaintiffs' patents.

19          Finally, Your Honor, on the burden point, we do

20   not think there's any real burden here to Ford running

21   straightforward with ESI terms for its employees.  We have

22   done it for our own custodians.  And if Ford says their

23   employees are doing a good job, it will simply be the case

24   that no or few new documents come up.

25          However, if it's as we suspect that it's not the

1    case, that means that there are significant responsive

2    documents that plaintiffs are entitled to in this

3    litigation.

4                 THE COURT:  What I'm hearing from plaintiffs is

5    things that Ford did not do in collecting responsive ESI

6    documents.  What is really a gaping absence from this

7    discussion is what Ford did do that supports the argument by

8    plaintiffs that there are gaps or an incompleteness in the

9    production.

10               Plaintiffs have not steered the Court to

11   anything in the production of documents, perhaps at the end

12   when you mentioned briefly Exhibits A and B to yesterday's

13   submission.  But in the moving submission, completely absent

14   is any case authority supporting a methodology that Ford

15   should be obligated to follow when doing the search.

16               Certainly, every case is different.  The volume

17   of ESI at issue in every case is different.  Some more

18   voluminous and thus more challenging than in other cases.

19               And I'm looking at Page 3 of Ford's submission

20   in opposition to the plaintiffs' motion, Document Item

21   Number 57, where Ford begins in this section to state on

22   Page 3 that Ford employed the following collection protocol

23   for custodians, and goes on to list in several paragraphs,

24   continuing throughout Page 4 of its submissions, of how it

25   employed a methodology that was reasonably calculated to

1    secure completeness of production for the eight custodians

2    that were not searching by search terms.

3            And you haven't addressed in any respect that

4    methodology and why it's deficient, and you haven't

5    addressed in any respect the cases which Ford cites at

6    Page 4 which seem to support that it was an appropriate

7    methodology to use.  So you may have a moment to address

8    those points, but I'll tell you, you haven't persuaded the

9    Court on this point as of right now.

10           MR. O'CONNELL:  Thank you, Your Honor.  To

11   address a couple of those points, I'll start with Ford's

12   methodology addressed on Page 3 under the heading Ford's

13   Document Collection Efforts.

14           In terms of the methodology, it doesn't resolve

15   the concerns that we've raised today because our concerns

16   relate principally to the concern about search terms mainly.

17   The methodology that Ford provided explains that during the

18   interviews, Ford and outside counsel concede the location

19   and nature of relevant documents that Ford employees had,

20   but it doesn't address in any way the concern that Ford

21   employees may not have disclosed and allowed the collection

22   of all the documents that were relevant.

23           For example, if the document were to hit on the

24   term EBS, or were to hit on a patent number, or were to hit

25   on one of the named specific classes of technical documents

1    that we've asked for, there's no certainty on this

2    location-based methodology that that document was reviewed,

3    collected, or even considered by the custodian in the first

4    place.

5              So that is our concern, Your Honor.  And to the

6    extent that Your Honor's persuaded that, as a general

7    matter, it is permissible to do this, we agree that that can

8    be appropriate in certain cases.  The problem here is that

9    there is certainly no showing by Ford that it's conducted an

10   adequate search with respect to finding specific classes of

11   documents, not only related to the technical materials, but

12   also narrow terms that could be run to disclose information

13   about the patents, about communications, about this

14   technology, and so on.

15             THE COURT:  Again, you know, you're speaking

16   very broadly and supposing that there is a level of

17   incompleteness to this.  You said the problem is it doesn't

18   address specific classes of documents.  I don't know what

19   "specific classes of documents" refers to.

20             Can you please explain?

21             MR. O'CONNELL:  Certainly, Your Honor.  If you

22   turn first to Exhibit 1 to defendant's responsive

23   submission.

24             THE COURT:  Yes.

25             MR. O'CONNELL:  This is the exhibit that they

1    rely on to explain that they think that they have produced

2    the relevant technical documents that pertain to the accused

3    products.  And for example, if you look to Page 1 of that,

4    you see that we ask for knock propensity studies,

5    pre-emission studies, knock sensor location tests, and so

6    on.

7              And next to that Ford cites a number of

8    documents that are not those studies themselves.  Even the

9    parenthetical that Ford cites indicates that they're not the

10   study, but are documents referencing those specific types of

11   tests.

12             That is an example from a technical perspective

13   of search terms could be used certainly to identify those

14   tests which we still do not have.  And then again, from the

15   willfulness perspective, we understand from the documents

16   that we have reviewed so far that there are likely other

17   communications that these employees have pertaining to the

18   patents or pertaining to EBS.

19             And we understand from counsel as well that they

20   believe that their initial collection was of such a nature

21   that we think that we have most of the relevant documents

22   that Ford at least thinks are relevant pertaining to these

23   custodians.  And that's what leads us to believe that there

24   are clearly responsive documents, including relating to the

25   willfulness inquiry and the infringement of plaintiffs'

1    patents that have not been produced to date.

2              THE COURT:  All right.  Let me have Ford address

3    that then.

4              MR. LIGOTTI:  Thank you, Your Honor.  This is

5    Andrew Ligotti from Alston & Bird.

6              At the outset, I think Your Honor identified the

7    issue squarely.  The default standard for Delaware's

8    discovery rules doesn't require the use of any particular

9    methodology, let alone search terms.  In fact, it

10   accommodates the idea that search terms may not be used.

11             And in the present case, Ford went through a

12   robust, guided, and detailed process that it regularly uses

13   in large-scale litigations.  And it did so over a period of

14   a couple months, and it did so thoroughly.

15             Unlike what plaintiffs continue to misrepresent,

16   this was not done where the custodians were allowed to go

17   off and do their own thing.  It was supervised.  It was

18   guided, and it was done specifically with the goal of

19   counsel providing guidance on the relevant issues in the

20   case.  This isn't a situation where engineers were left to

21   decide what was at issue in the case and what wasn't as

22   plaintiffs misrepresent.  This methodology has been deemed

23   acceptable.

24             It also is telling that plaintiffs cannot point,

25   as Your Honor noted, to any instance where something is

1   missing.  For instance, they point to Exhibit A which was

2   part of Ford's claw-back production, and they say that the

3   document demonstrates that there were many discussions back

4   in '14 and '15 on this topic.  Yet, it's clear from the face

5   of this document itself that that is in reference to the

6   Auto News article that is earlier in the chain, which if

7   plaintiffs reviewed that article, outlines all of the

8   discussions that are identified in the complaint.

9         So thus, this document represents some sort of

10  realm of other documents involving discussions is just not

11  clear from the face of the document itself.  Instead, citing

12  to that Exhibit A is to try and cover up that at the end of

13  the day, this is mere speculation.  Counsel for plaintiffs

14  has simply said that they think that there are other

15  discussions, and that they would expect to see

16  communications regarding EBS or other issues amongst Ford's

17  custodians.

18        But that is not what is necessary to require

19  Ford to undo months of work that was done from a very guided

20  and robust perspective to generate the large volumes of

21  documents that were produced.  And it also bears noting that

22  the custodial productions that Ford has produced to date are

23  not a circumstance where they are minimal.  I mean, we are

24  talking about thousands of documents from some custodians.

25  And as Exhibit 1 to our letter demonstrates, a

1    non-exhaustive list of just how detailed these documents are

2    about the technical issues with respect to the accused

3    instrumentalities.

4              And I would also note that the reason that Ford

5    uses this sort of collection process is because Ford is a

6    very large company, and the custodians themselves are very

7    aware as to how these documents are kept in their day-to-day

8    businesses, where to get them, and how to retrieve them,

9    which is why the first step that Ford takes is to identify

10   all the potential custodians that are involved in the design

11   and the development of these particular engines, have

12   conversations with them to identify the location of where

13   the information is allowing counsel to monitor and watch

14   that process.

15             And it follows that this process of gathering

16   documents from a number of different locations, including

17   the custodial email inboxes, but also other locations from

18   across Ford, collecting documents in that manner makes sense

19   because running search terms on each and every location

20   identified by a custodian, it would be overly burdensome.

21   And it's for that reason that we leverage the knowledge of

22   the custodians to identify the proper locations to search

23   and collect documents.  And that's exactly what we did.

24             There's been no showing of any deficiencies in

25   the sense that there are documents that were withheld or

1    weren't identified.  When plaintiffs' counsel says that

2    there may be some documents that may be detrimental to a

3    custodian and withheld, that's the quintessential example of

4    speculation.

5            And finally, we've told plaintiffs that to the

6    extent that they identify specific documents, and they do

7    identify some specific documents in their submission for the

8    first time using Mr. Richard Davis' declaration, we'll

9    endeavor to go back, and to look, and to make sure that we

10   can identify those documents and produce them.  And so to

11   say that there are a handful of documents that they've

12   identified and that somehow represents that the entire

13   search methodology that Ford employed from the outside of

14   the case is improper, it's to tie two things together in a

15   way that would lead to a burdensome and detrimental result

16   for Ford to have to go back to the very beginning and start

17   this process all over again.

18           THE COURT:  All right.  A few things --

19           MS. CLAYTON:  Your Honor, this is Natalie

20   Clayton for Ford.  If I can make one other point.

21           THE COURT:  All right.

22           MS. CLAYTON:  In my experience, there's also no

23   guarantee that using search terms gets you all of the

24   relevant documents.  Routinely in cases when search terms

25   are used, after reviewing a party's production, you notice

1    that there are some documents that are missing, and you go

2    back and ask the other side for those documents.

3         Plaintiffs have done that now with their other

4    methodology that we used, and we're endeavoring to look to

5    see if the documents they've now requested exist.  But

6    simply to paint with a broad brush and say what we did is

7    improper and that only search terms can be used, I don't

8    believe that's supported by the facts or the case law in

9    this instance, Your Honor.

10        THE COURT:  Okay.  I have a question for

11   Mr. Ligotti before I hear back from plaintiffs.  Mr. Ligotti

12   and/or Ms. Clayton, whoever is in the best position to

13   answer it.

14        In reviewing the briefing for this discovery

15   dispute, I came up with my checklist of things that were

16   mentioned specifically which I'm going to tick off for the

17   parties or for the defendant, Ford, right now.  And I don't

18   presume that this is an exhaustive list, it's just what I

19   picked up on when I read the briefing.

20        And what I'd like to know is:  Has Ford produced

21   already or is it making an effort to supplement its

22   production and look specifically for these specific items on

23   the checklist that I constructed from reading the briefs

24   that I believe plaintiffs are still interested in making

25   sure they have?

1       The first is what came up in our last discovery

2  dispute hearing.  It was tests and studies which include,

3  but may not be limited to, but certainly include knock

4  intensity studies, pre-ignition studies, knock sensor

5  location tests, direct injection fuel injector deposit

6  tests, dyno test plans for the accused engines, release

7  notes for Ford's fuel-system-related software, VST files, a

8  file listing of Ford's PFDI member share point group folder,

9  and National Highway Traffic Safety Administration reports,

10  and testing docs.

11       Not all of those may have come up at the last

12  hearing, but certainly the first one that I mentioned

13  starting with knock intensity studies did.  So what is the

14  status of looking specifically for those items, Mr. Ligotti?

15       MR. LIGOTTI:  Yes, Your Honor.  At the outset,

16  with respect to the categories of documents that Your Honor

17  mentioned, Ford's production is filled with many instances

18  of those documents or documents that have the content of

19  those studies and tests.  And we've identified but a few

20  examples of situations like that.

21       For instance, Exhibits 1.1 and 1.2 as well as

22  1.3 include the injector deposit test that plaintiffs

23  request.  Other examples of Ford's production, including

24  those documents requested, are the testing update emails

25  that indicate the tests that were run and the results of

1    those tests.  And there's a lot of other examples within

2    Ford's production for the documents that support Ford having

3    produced those requested documents.

4              That said, the specific instances that have been

5    raised by plaintiffs, we are going back to the client and

6    working to make sure that anything that was specifically

7    identified that wouldn't have been -- isn't enforced

8    production already, will be collected and produced as well,

9    and we're in the process of doing that.

10             THE COURT:  Can you give me a timeline

11   reasonable estimate as to when that can be concluded so that

12   plaintiffs have some sense of an expectation of when they

13   might have that information?

14             MR. LIGOTTI:  It probably could be completed in

15   two to three weeks, Your Honor.

16             THE COURT:  All right.  Anything further before

17   I hear any brief rebuttal from plaintiffs?

18             All right.  Hearing none, I'll hear from

19   Mr. O'Connell again.

20             MR. O'CONNELL:  Thank you, Your Honor.  A couple

21   brief points responsive to those raised by Mr. Ligotti.

22             In response to our inquiries, we still haven't

23   received an explanation of how Ford's custodians themselves

24   as opposed to how Ford's counsel searched for documents.

25   What the responsive submission states is that Ford's counsel

1    was monitoring the location the custodians identified, but

2    it doesn't explain how the custodians themselves identified

3    what was responsive or how Ford checked that those

4    custodians weren't holding anything back.

5            If there's some means that Ford's aware of

6    presently about how or why it knows that its custodians

7    weren't withholding relevant documents or emails, we think

8    Ford is capable of answering that question today.

9            As a cross check, we do think that search terms

10   would be extremely helpful.  If we received similar numbers,

11   the amount of documents that have been produced in this

12   case, that would be a good indication perhaps that the

13   methodology works with respect to some types of documents.

14   And if it's not, it will show that it isn't.

15           Even more narrowly, with respect to limited

16   search terms for something as simple as EBS or the patents,

17   plaintiffs' position is that we don't understand why that's

18   not used as a cross check.  That is a very limited search

19   that would be extremely simple to run, particularly against

20   a simple database like the employees' emails databases.  It

21   would pose no burden to Ford.

22           And finally, I just note in closing, Your Honor,

23   that we have asked Ford for a deposition to test the

24   representations about how it conducted custodial searches.

25   And to the extent that we'd ask that, we would also request

1      that Your Honor allow us to proceed very quickly with a

2      30(b)(6) deposition to test the representation that it's put

3      forth in its letters and to the Court today.

4              THE COURT:  All right.  Let me hear from Ford.

5      I wasn't aware that there was any resistance to doing that.

6      Perhaps I overlooked something in the briefing, and I

7      apologize if I did.

8              Mr. Ligotti.

9              MR. LIGOTTI:  Yes, Your Honor.  With respect to

10     the issue of the depositions, there is no resistance to

11     that.  We're in the process of working out with plaintiffs

12     that which they have requested.

13             One issue or one point that Mr. O'Connell raised

14     is that from plaintiffs' view search terms would be helpful

15     to confirm whether or not their suspicions and mere

16     speculations that there are additional documents out there

17     that weren't already collected is true or not.  And putting

18     aside the fact that it is, indeed, speculation that fuels

19     that, it would result in an additional burden.

20             And as I noted earlier, in addition to the

21     custodial email sources that are indicated here, Ford has

22     dozens, if not more than dozens, locations of where it holds

23     documents for all its different engine programs that changes

24     over time.  It's not simply the case where there's one batch

25     of data that exists currently where a search term can be run

1  immediately, and we can verify plaintiffs' suspicion.

2        It would, indeed, be a burdensome effort to go

3  back and undo months of work to identify the relevant

4  locations, compile the raw data, and run search terms just

5  to verify what EBS and MIT suspect may or may not be the

6  case.

7        And I think that at the end of the day, it

8  really is telling that there has been no showing that

9  anything that Ford did is problematic in the sense that it

10  was a thorough and extensive effort that it went through to

11  identify the custodians, identify the locations, and work

12  together with the custodians to collect the documents, other

13  than mere speculation that they would expect to see

14  additional documents for the other -- other documents should

15  have been produced without any specifics.

16        And so I think that asking Ford to go back and

17  redo this effort based on that is just simply not warranted

18  in this case.

19        THE COURT:  All right.  I'm going to -- go

20  ahead.

21        MR. O'CONNELL:  I'm sorry.  Your Honor, on the

22  deposition issue, I just want to point out that we made this

23  request on August 28th.  And so we respectfully request that

24  we begin the deposition date within the next two weeks with

25  respect to testing the manner in which Ford conducted its

1    custodial searches.

2         THE COURT:  All right.  I'm prepared to make a

3    bench ruling on this transcript with respect to this

4    particular issue.  And I will grant in part and deny in part

5    the request that has been made by plaintiffs.

6         The part I will grant is that with respect to

7    the specific categories of documents that I listed on this

8    record based upon my review of the parties' submissions and

9    based upon Mr. Ligotti's representation that he believes

10   that that production can be supplemented if needed within

11   the next two to three weeks, I will order that production of

12   those specific categories of documents be made within two

13   weeks.  And that if for some reason it cannot be done within

14   that time frame and more time is required, that Mr. Ligotti

15   so notify plaintiffs' counsel, and the parties meet and

16   confer on that.  If there's an issue about how much

17   additional time might be needed, then you can come back to

18   the Court with that.

19        In the same vein, within the next two weeks,

20   Ford is to provide dates for the depositions of the

21   custodians that have been requested by the plaintiffs to

22   determine the level of completeness of the document search.

23        With respect to the balance of the request made

24   by the plaintiffs, which again, I find too general really to

25   be able to address, and as I said earlier, I find are more

1    framed in the negative.  That is, what Ford has failed to do

2    as opposed to what it has done to accomplish its

3    responsibilities with respect to core technical document

4    production.  That part of the request is denied without

5    prejudice.

6              First of all, if I'm going to address this

7    issue, I want to be certain that the plaintiffs have

8    thoroughly reviewed the production to date and are in an

9    informed position to meaningfully present to the Court what

10   deficiencies exist.  I'm concerned that there hasn't been

11   the development of a record of deficiencies, at least on the

12   record before the Court at present.

13             The defendant is correct that the default

14   discovery standard at 5b begins with the phrase, If the

15   producing party elects to use search terms to locate

16   potentially responsive ESI, then it goes on to explain what

17   the obligations are.  So it is an election on the part of

18   the producing party.

19             And as I said, every case stands alone on its

20   facts.  I'm not saying on this record that what I feel

21   appropriate to decide in this case is going to be useful for

22   any other cases down the line.  But given what I've heard

23   and have no reason to disagree with from Ford, that is, that

24   Ford followed a process it uses in large-scale litigations

25   and supervised and guided that process throughout the course

1    of it.  It identified all potential custodians at the design

2    and development level of these particular engines, and

3    counsel monitored that process, particularly in this

4    instance where there may be multiple locations where

5    relevant documents may be stored.

6         And counsel worked with the custodians to ferret

7    out those locations and to select the documents necessary

8    for production to satisfy its obligation to produce core

9    technical documents.  So I don't see any concrete showing of

10   deficiencies on this record.

11        And furthermore, in reviewing some of the case

12   authorities that Ford presented to the Court in its

13   opposition papers, there are a number of cases which approve

14   of searches in this fashion.  One that I'll note for the

15   record is *Mirmina vs. Genpact*.  It's 2017 Westlaw 3189027.

16   It's from the District of Connecticut, decided July 27,

17   2017.

18        And that seems to have involved the collection

19   procedure analogous to those taken here by Ford which was

20   found to be sufficient.  That is, the issuance of a

21   litigation hold, instructions to the ESI custodians, and the

22   nature of how Ford says it's monitored its custodians here,

23   an explanation given about the importance of a thorough

24   search of ESI custodians and guidance provided by counsel.

25   And thereafter, outside counsel conducting a review for

1    processing and production.

2         So I mean, there are ways in which to go about

3    this that are not necessarily irretrievably tied to use of

4    search terms.  There may be other cases in which use of

5    search terms is a more efficient way to search, but I find

6    that what Ford did, at least on the record that it made here

7    in its opposition papers, is sufficient.

8         Now, should the plaintiffs bring forward from

9    their review of the production anything that would

10   demonstrate an incompleteness, or a gap, or missing pieces

11   of an email chain or communications that are suggested to

12   have occurred, but for which documents have not been

13   produced, then the Court is certainly open to revisiting

14   this discovery issue.  But for now, I will leave my ruling

15   at that, and I'll be prepared to move on to the next issue

16   raised by the plaintiffs.

17        But before I state that, let me state what I

18   typically state on this record that discovery rulings are

19   governed by Rule 72(a) of the Federal Rules of Civil

20   Procedure.  This transcript will serve as the order of the

21   Court.  I will not be issuing a written memorandum order in

22   connection with this dispute, and the parties are guided by

23   the procedures and timing requirements of Rule 72(a) in

24   terms of bringing objections to the attention of Judge Colm

25   Connolly, the district judge assigned to the case.

1          So with that, let's move on to the next issue.

2     Mr. O'Connell.

3          MR. O'CONNELL:  Yes, Your Honor.  I think we can

4     shorten this a little bit by just turning to the technical

5     documents because I understand that you've just ordered Ford

6     to supplement its production of technical materials within

7     the next two weeks.

8          I just want to be clear and make sure that we're

9     capturing all of the documents that have been requested on

10     that point.  And I just wanted to ask the Court and

11     Mr. Ligotti whether this will include the classes of

12     documents that we have specifically identified on Pages 2 to

13     3 of our September 12th letter, and the software guide, the

14     calibration manuals that Mr. Davis identified in Paragraph 9

15     of his affidavit.

16          THE COURT:  I'll ask Mr. Ligotti to address

17     that.  I tried to come up with a comprehensive listing from

18     what I interpreted from plaintiffs' papers, and if I didn't

19     capture it all, let me ask Mr. Ligotti if there's any reason

20     for the documents that have been identified just now by

21     Mr. O'Connell that they wouldn't be wrapped into the search.

22          MR. LIGOTTI:  Yes, Your Honor.  Well, at the

23     outset, the documents referenced on Pages 2 to 3 of

24     plaintiffs' September 12th submission and some of the

25     documents referred to in Exhibit C, Mr. Davis' declaration,

1    the documents that they're referring to are not specific.

2    They encompass the genus of documents that absolutely have

3    been produced in this case.

4            For instance, the calibration guide for fuel

5    monitoring of the PFDI system was produced in this case.

6    Documents, schematics, other technical documents that

7    indicate how the systems are controlled by the PFDIM and

8    F_HLD software programs, those have been produced in this

9    case.  Release notes for the fuel-system-related software

10   have been produced in this case.

11           Now, with respect to some of those bulleted

12   entries such as dyno test plans, release notes, our

13   Exhibit 1 indicates many instances of some of those

14   documents having been produced.  What plaintiffs are

15   requesting is all for each of those categories.  So all dyno

16   test plans, all release notes.  That we would say is an

17   overly burdensome search when phrased that way, but we will

18   endeavor to go back with our client and have a conversation

19   with them about the documents that they refer to in their

20   letter and make sure that those documents either have been

21   produced or will be produced.

22           THE COURT:  All right.

23           MR. O'CONNELL:  Your Honor --

24           THE COURT:  Go ahead, Mr. O'Connell.

25           MR. O'CONNELL:  Just the two points that I think

1    were not mentioned, just to be clear, that in our letter we

2    also requested the documents that Ford has pertaining to

3    governmental reports or testing of the accused products,

4    including the National Highway Traffic Safety Administration

5    report and documents related to that.

6              THE COURT:  Mr. O'Connell, I went down that

7    list, and they were on my list.  So I'm getting lost here in

8    the weeds as to the disconnect between what I mentioned when

9    I ticked off that list and what you're bringing up now.

10             And I don't think it's the appropriate time to

11   split hairs over these things.  I think, as I said earlier,

12   I would like to see plaintiffs go through what Ford has

13   done, what Ford has produced, and then make a record for me

14   if there are deficiencies perceived by the plaintiffs that

15   show me why plaintiffs believe there are deficiencies here.

16   And if they relate to any of these categories that you're

17   bringing up, then we'll deal with them at another time after

18   this supplementation is made within two weeks.

19             And I would further add that if you're going to

20   revisit this with the Court, make a stronger record, and

21   also it would be helpful to have a proposed form of order

22   that specifically identifies what documents you would like

23   the Court to order production of so that I have a clearer

24   roadmap rather than these more generalized comments about

25   things not being produced.  Because I'm hearing from

1    plaintiffs, this category of documents hasn't been produced.

2    And I'm hearing from Ford, yes, it has.  Look at our

3    Exhibit 1 to the response.

4              And you know, nobody's helping me out here to do

5    the comparison.  So I think that comparison needs to be

6    done, and shown to the Court, and a more clearer record made

7    with a more specific form of order proposed so that I can

8    address any deficiencies that are argued in the future.

9              MR. O'CONNELL:  Thank you, Your Honor.  We're

10   happy to move on to the other issues in the letter.

11             THE COURT:  All right.  Very good.

12             MR. O'CONNELL:  Your Honor, moving on to the

13   copy with pride issue, this is the request made in our

14   letter that Ford provide the documents relating to its copy

15   with pride program, as well as documents from Mr. Hau

16   Thai-Tang who Ford is not providing to plaintiffs as a

17   custodian.

18             From our perspective, Your Honor, this is fairly

19   straightforward.  All we're requesting is, one, that Ford

20   run this search term copy with pride for its existing

21   custodians and produce the resulting documents.

22             And two, to run very limited terms against

23   Mr. Hau Thai-Tang's documents for copy with pride and

24   documents that relate to EBS or the patents.  In terms of

25   the burden, there is minimal burden to doing this.  It is

1    one term and a narrow set of documents against a single

2    custodian.

3          And our concern here is that the reason that

4    Ford is pushing back against this term is that the notion

5    that this term will, in fact, pull up responsive documents

6    and will support plaintiffs' willful infringement case.  And

7    this is not a situation where we're guessing in the dark as

8    to whether or not these documents exist.  We know that Ford

9    has these documents.

10          We included as Exhibit J to our letter a copy of

11   the presentation that Mr. Hau Thai-Tang has given Ford's

12   engineers about the copy with pride program.  And on that

13   point, Ford's contention that it shouldn't run a term, a

14   single term for documents that we know exist and that we

15   know are responsive, we don't find plausible.

16          With regard to Mr. Hau Thai-Tang, just to

17   distinguish from the argument that Ford is making, we are

18   not asking yet at this time that Mr. Thai-Tang's deposition

19   be offered.  We're just asking for a limited set of searches

20   for responsive material on Mr. Thai-Tang's documents.

21          The case that Ford cited, the *Galmines vs*.

22   *Novartis*, a False Claims Act case is about the Apex

23   Doctrine, and that's a doctrine that, even that decision

24   acknowledges, is limited to this context of compelling a

25   deposition of an executive.  And indeed, in that case, a

1   non-party executive.

2          That's not what we're trying to do here.   All

3   we're asking for is the limited set of documents pertaining

4   to -- one search term pertaining to a series of custodians,

5   and a limited set of documents from one custodian.   And in

6   the Galmines case, it was a foregone conclusion that the

7   plaintiffs already had the documents of the custodian that

8   they had asked for.

9          In terms of the application of the Apex Doctrine

10  in Delaware, we'd cite the Court instead to the Intel Corp.

11  case.   That's 2008 Westlaw 5377979 District of Delaware,

12  December 18, 2008.   And that's a case in which Judge Farnan

13  adopted special master's order concluding that even

14  non-party depositions of certain executives with important

15  testimony could be compelled.

16         And again, we cite that to Your Honor

17  acknowledging the question presented here that, even

18  reaching the level of deposition for Mr. Hau Thai-Tang,

19  we're merely requesting a limited set of documents from a

20  custodian with whom we understand that Ford has not yet

21  collected documents.

22         THE COURT:   All right.   I have a couple of

23  questions.   Again, turning to Page 2 of Ford's submission,

24  in the first instance, they say that this article from which

25  this copy with pride assertion of a program comes from the

1    plaintiffs, they say that that article has nothing to do

2    with the case.

3            In any event, they say that Mr. Thai-Tang's

4    records should not be searched, not just based upon the Apex

5    Doctrine, but because he stepped into the role in June of

6    2017, largely after the accused engines were developed, and

7    was not involved in the day-to-day work of the design of the

8    engines, and that there are other custodians at Ford whose

9    records have been searched that are more relevant to the

10   issues pending in this case.

11           Can you address each of those?

12           MR. O'CONNELL:  Certainly, Your Honor.  And just

13   to divide it into two pieces, I just want to be clear to

14   distinguish the issue of the copy with pride term being run

15   against the existing custodian where we think that there

16   really is no additional burden given these custodians have

17   already been consulted by Ford, and it's a single term, and

18   the question of whether the Court would order a production

19   and collection of such documents from Mr. Thai-Tang.

20           With respect to the Court's question about the

21   relationship between the copy with pride program in this

22   case, there are two reasons that it's connected.  First, it

23   is explicitly connected online in the public reporting on

24   this piece that Ford has engaged in a practice of copying

25   competitors' technology in the past and specifically

1    mentions this litigation.

2              But more broadly in these cases, the question of

3    subjective recklessness and subjective knowledge with regard

4    to infringement is something that the jury is free to decide

5    in this case.   I direct the Court to the *Georgetown Rail*

6    *Equipment Company Case vs. Hollins*.   That's 867 F. 3d 1229,

7    1245, Federal Circuit 2017.   That the jury is free to decide

8    whose evidence it finds more compelling on the question of

9    willfulness, including on this question of subjective

10   recklessness.

11             And this copy with pride program is evidence

12   that we will use going on in this case as evidence of Ford's

13   recklessness with regard to the manner in which competitors'

14   technology is copied, if not actual direct knowledge of the

15   fact that it has copied competitors' technology.   And on

16   that point, we think it's a key to that inquiry.   And given

17   the fact that there are public documents already connecting

18   that program to this case, we think it is proper and will

19   impose minimal burden to collect those documents from the

20   existing custodian.

21             With regard to Mr. Thai-Tang, again

22   acknowledging Ford's arguments about cases that are premised

23   on deposition, and he stepped into the role recently, I

24   understand the point that he has stepped into the role

25   recently.   But since that time, he has given a presentation

1    that has been publicly revealed about the Ford copy with

2    pride program, and that is our basis for requesting

3    additional documents from him.  In addition to the fact that

4    in our complaint and from the beginning of this action, we

5    have quoted statements that Mr. Thai-Tang has made about the

6    accused products.

7              THE COURT:  All right.  I'll hear from Ford.

8              MR. LIGOTTI:  Thank you, Your Honor.  Andrew

9    Ligotti from Alston & Bird.  First and foremost, I think all

10   of plaintiffs' arguments are met by or predicated on a

11   misrepresentation of a single article somehow evidencing a

12   persuasive program that's existed within Ford for years.

13             It's nothing of the sort.  It's an Automotive

14   News article that was published just recently, and it does

15   mention in this litigation.  Yes.  But it is about another

16   litigation, the Versata Litigation, and it's unrelated

17   entirely.

18             And it has a single image in it that refers to a

19   power-point that Mr. Hau Thai-Tang gave in 2018.  And it

20   just bears noting that, as you can see from that image in

21   Exhibit J, it says benchmark and copy with pride.  And

22   without getting into the weeds of the automotive technology

23   world, benchmarking is a common industry standard practice

24   where an engine is taken, and tested, and the data that

25   comes from that testing is known as the benchmarking of that

1    engine.

2          It's very common across the industry.  In fact,

3    the benchmarking of the Toyota V6 engines in the mid-2000's

4    demonstrates quite clearly the PFDI technology that

5    plaintiffs claim to have invented in the patents-in-suit

6    which existed long before then.

7          So this is something where they've taken an

8    image in an article that's irrelevant and drawn these

9    massive conclusions about what it represents.  And in due

10   correspondence with Ford, plaintiffs have referred to it as

11   the copy with pride program training.  They refer to it as a

12   copy with pride slogan.  They've referred to it as a policy.

13          It's all derived from this single image in an

14   Automotive News article.  Nothing more, nothing less.  And

15   so to say that that is the hook to burden a senior executive

16   at Ford, an executive vice president of product development

17   and purchasing is to really stretch what that article is.

18          And I would note that we've mentioned the Apex

19   Doctrine which is often utilized in the context of

20   depositions, not because this is in the context of a

21   deposition, but because it's a tool for guiding the Court's

22   analysis in whether to limit discovery under

23   Rule 26(b)(2)(c) which is not limited to only depositions.

24          And the Court must limit the frequency or

25   extensive discovery otherwise allowed by these rules or by

1    local rule if it determines that the discovery is

2    unreasonably cumulative, or duplicative, or otherwise

3    outside the scope, or obtained from another source that is

4    more convenient, less burdensome, or less expensive.  We

5    pointed to these cases as representation that Mr. Thai-Tang

6    is a senior executive with no direct relevance to any of the

7    issues that are actually in this case.

8              Plaintiffs cite to, I think, one public

9    statement where he's referring to the Ford F150 and its new

10   V6 technology.  That a senior executive at Ford would make a

11   single public statement or even a couple public statements

12   about one of Ford's most successfully selling vehicles is

13   not a sufficient nexus to tie a single image from an

14   Automotive News article and establish a persuasive program

15   that would warrant Ford's going and obtaining documents from

16   Mr. Thai-Tang, searching for them, and producing them in

17   this case.

18             He has no relevance to the issues of this case.

19   And in his role as executive vice president of product

20   development and purchasing, he has people that are junior to

21   him, some of which have been identified as Ford's custodians

22   in this case, and we have collected and produced thousands

23   of documents that get into the specifics of how the engines

24   were designed and developed.

25             And so we cite to the cases on the Apex Doctrine

1   to point out that it provides an analysis for the Court to

2   use in deciding whether to utilize its power under

3   Rule 26(b)(2)(c) as emblematic of the fact that it should

4   utilize that power here.  And I would also note that one of

5   the considerations in whether the Apex Doctrine should be

6   wielded is whether or not the person who -- the Apex witness

7   who has been identified has any specific, personal, unique

8   non-duplicative knowledge.

9          And there is a nexus requirement that that

10  specific and personal knowledge has a relation to the issues

11  in the case.  And that's why I point out, Your Honor, that

12  the plaintiffs' nexus here is tenuous at best.  In fact,

13  tenuous is definitely too strong of a word.  They've

14  identified a single Automotive News article that has a

15  single image in it, and they've tried to connect that to the

16  technology that Ford has been developing since at least

17  2012, 2013, long before Mr. Thai-Tang stepped into his role

18  as executive vice president, long before Mr. Thai-Tang had a

19  single slide that said benchmark and copy with pride, which

20  again, as I pointed out, refers back to the industry

21  standard of benchmarking, and certainly long before the

22  plaintiffs brought this case.

23         And so I think here it's fair to keep in mind

24  the context that plaintiffs have asked Ford to take its

25  additional custodians and add yet another one that has no

1    relation to the case.  And it seems that the record is

2    extremely thin here for supporting that request.

3                    THE COURT:  All right.  Response, Mr. O'Connell.

4                    MR. BERRY:  Yes, Your Honor.  I think Ford is

5    conflating two issues here, and they're two separate

6    questions that are raised by our request.

7                    The first which Ford began with is the request

8    for documents from Mr. Thai-Tang as an additional custodian.

9    But more fundamentally, our request is for documents about

10   the copy with pride program.

11                   And what Mr. Ligotti acknowledged in his

12   argument is, regardless of whether or not what

13   Mr. Thai-Tang's possession of its program and giving of this

14   presentation, he has people junior to him who would also

15   have, one would assume, copies of this presentation.  And in

16   Mr. Ligotti's argument, he made a number of points stating

17   that Ford has no copy with pride program, that Ford has no

18   copy with pride slogan, it has no trainings, and so on.  If

19   that's the case, having the existing custodians from whom

20   Ford has already collected documents, that running against

21   their original document set a single term, copy with pride

22   will determine whether or not that representation is true.

23                   If there are no such documents, if there's no

24   burden, there will be no documents to produce.  But if there

25   are documents, they are documents that are going to be

1    relevant to whether or not Ford does, in fact, have a

2    slogan, a training, a presentation, a mantra of teaching

3    engineers to copy the intellectual property of others.

4            THE COURT:  All right.

5            MR. LIGOTTI:  Your Honor, if I could just reply

6    briefly to Mr. O'Connell's points?

7            THE COURT:  Go ahead.

8            MR. LIGOTTI:  With respect to the issue of

9    whether additional searches should be run on Ford's present

10   custodians, this is, once again, a circumstance where

11   plaintiffs use mere speculation to sort of tie together a

12   request to add additional terms.  But it also bears noting

13   that, as we just discussed with Ford's document collection

14   process, Ford does not have the custodial data isolated in

15   the sense where it can easily run search terms.  That's not

16   the methodology that was utilized for the majority of Ford's

17   custodians.

18           And so there is a burden here, and it's not --

19   plaintiffs just presume that there is no burden because it's

20   one term, but these custodians would have to have their data

21   imaged and isolated in order to allow Ford to be in a

22   position to run that term.  And doing that, based merely on

23   the speculation that comes solely from this one article in

24   the Automotive News website, is not warranted in this case.

25           THE COURT:  All right.  Having heard the

1    arguments of counsel and read the briefs, I'm prepared to

2    issue a ruling on this issue.  And I am going to grant it in

3    part and deny it in part.

4          The part that I will deny will be to add

5    Mr. Thai-Tang as a custodian.  That is presently denied

6    without prejudice.

7          The part I will grant is to add the copy with

8    pride search term to be run against the existing custodians

9    and existing document sets.  I think that the plaintiff has

10   sufficiently established in this article the significance of

11   running that search term.

12         The parties dispute the significance of this

13   article.  The parties dispute the interpretation or how the

14   Court should interpret this article, yet the Court finds

15   that there are enough references to issues and this specific

16   litigation which make the copy with pride search term

17   relevant.

18         As to burden, that argument hasn't really been

19   developed, except on this record.  So if at a future time,

20   after conducting this search for the additional term copy

21   with pride, Ford wishes to make an application for the

22   plaintiffs to bear some portion of the cost of that, you're

23   free to do so.  I'm not saying that the Court would grant

24   it, but I have no way of assessing the burden, the expense,

25   the time commitment of doing that other than what I've heard

1    on this call that records need to be imaged, and isolated,

2    and searched.  And you know, there's no limitations on that,

3    or concrete costs, or time commitments associated with that

4    that have been mentioned on this record that would allow the

5    Court to assess just how burdensome it is.

6             But I think, as I said, based upon the article

7    which has been submitted by plaintiffs, there is a

8    sufficient basis to go forward with adding that search term.

9    So that is my ruling with respect to that issue.

10            What further issues remain for the plaintiffs,

11   Mr. O'Connell?  It's my understanding that --

12            MS. CLAYTON:  Your Honor --

13            THE COURT:  Go ahead.

14            MS. CLAYTON:  -- this is Natalie Clayton.  Can I

15   please ask for some clarification on that ruling just to

16   make sure we understand what the Court is ordering?

17            So, obviously, we have the two custodians with

18   whom we used search terms, and we understand the Court is

19   ordering us to use the search terms on their documents that

20   we have collected.  For those custodians for whom we did not

21   use search terms, and there is not an isolated set of --

22   there's data, right, that would have -- full searches could

23   be easily run.

24            Is the Court ordering us to run searches on

25   those custodians, nonetheless, or are we to employ the same

1   type of searches we previously conducted with those

2   custodians in looking for documents that would relate to the

3   article or anything related to copy with pride?

4         THE COURT:  For those eight custodians that you

5   haven't used search terms, you are to go back to those

6   custodians with the relevant portions of this transcript and

7   direct them that this Court has ordered them to produce

8   records that relate to the copy with pride program and have

9   those records searched and produced, if any exist.

10        MS. CLAYTON:  Understood.  Thank you for the

11   clarification, Your Honor.

12        THE COURT:  All right.  Next issue,

13   Mr. O'Connell, I think I read that -- and plaintiffs may

14   dispute this, but I read in defendant's submission that the

15   issue of source code is moot at least for the moment.

16        Do plaintiffs agree?

17        MR. O'CONNELL:  Your Honor, one caveat on it.  I

18   suppose two caveats.

19        The first is that Ford has not given us a

20   specific date by which it will produce the source code.  And

21   just mindful of the Court's admonition last time that Ford

22   would have to act quickly once it was determined that this

23   source code was relevant based on the evidentiary record, we

24   request that the Court order Ford to make the code available

25   as we recommended September 25th in our letter.

1            And then the second point was that we'd request

2    that a manifest of all code for the fuel management system

3    of the accused products be provided.  Ford is already

4    required under the terms of the Protective Order to give us

5    a manifest of the source code that they're producing which

6    we understand, and Ford can correct us, is the PFDIM and

7    F_HLD code, but Ford is not agreeing to provide a manifest

8    with regard to other programs that may interact with it or

9    that may be necessary to understand the code.

10            And so we'd respectfully request that the Court

11    simply ask Ford to provide a manifest of the fuel management

12    system code which is simply a list of the files that the

13    parties can use to determine whether or not there's other

14    relevant code that may be necessary.

15            THE COURT:  Mr. Ligotti, can you address that?

16            MR. LIGOTTI:  Yes, Your Honor.  First, with

17    respect to the requested date that plaintiffs provide of

18    September 25th, we'll note that we made the determination

19    that we were unable to make the review of the source code

20    available on Friday.  We have not yet had an opportunity to

21    have a discussion with plaintiffs and meet and confer about

22    a number of issues related to making that available.

23            The Protective Order has a number of protocols

24    that I think we need to circle up with plaintiffs on and

25    answer before we can give a date certain.  And we were

1   hoping to have that conversation with plaintiffs following

2   this call or tomorrow and get that process started.

3           In a similar sense, Mr. O'Connell notes that

4   they've requested a manifest for the fuel management system

5   in particular.  Our understanding was that they have been

6   requesting a manifest for the entirety of Ford's ECU and

7   software installed in the vehicles, and so we had objected

8   to that thinking that it was overly broad.

9           If instead it's a different request that it's a

10  manifest for the fuel management system, we can meet and

11  confer when we're determining the particulars of the

12  Protective Order's protocol and see if we can reach

13  agreement on that point, Your Honor.

14          THE COURT:  All right.  Anything further,

15  Mr. O'Connell?

16          MR. O'CONNELL:  Yes, Your Honor.  On the

17  manifest issue, we're not trying to narrow our request.  To

18  the extent that Ford is understanding that we're asking for

19  less, I don't think we are.

20          The manifest is a fairly straightforward

21  low-burden document to produce.  It's just a list of the

22  folder structure that contains the ECU code.  And so to the

23  extent that the fuel management system code is less than

24  what's contained in the ECU, we would ask for a manifest of

25  the code that is contained in the ECU.

1          And second, with regard to the production date,

2     this has been an issue for many months.  The Court heard

3     this dispute about whether or not Ford has to produce source

4     code for the first time many months ago.  I believe in June.

5     Plaintiffs' concern is just that if Ford leaves this hearing

6     today without a firm date by which it's going to produce the

7     code, this will simply drag on for many weeks as this has.

8     And mindful of the fact that Judge Connolly has requested

9     that this action be kept on schedule and the parties work

10    towards moving along in the accelerated timeline, we request

11    that the Court provide a date by which Ford must produce the

12    code so that we do not need to raise this issue a third

13    time.

14          MR. LIGOTTI:  Your Honor, if I could briefly be

15    heard on that last point?

16          THE COURT:  Sure.

17          MR. LIGOTTI:  With respect to reaching agreement

18    with plaintiffs and how that affects the date, there are

19    concrete issues that are raised by the protocol that are

20    unanswered.  For instance, where specifically the laptop

21    will be made available, costs associated with that laptop,

22    programs, software programs that will installed in that

23    laptop.  And specifically with respect to the location,

24    leases, or other sort of information, or other sort of

25    accommodations to make the laptop available at a particular

1    location has to be sorted out.

2           And until we get an answer from plaintiffs that

3    will stem from a conversation that we have not yet had with

4    them, it's unclear as to exactly what the time frame is that

5    is at issue here.  That said, we would expect to move

6    quickly on this, and we, you know, like I mentioned earlier,

7    would like to have a conversation with plaintiffs shortly

8    after this hearing to start to iron out some of those

9    particulars.

10          THE COURT:  All right.  Well, here's what I'm

11   going to do.  I am going to impose a deadline of

12   September 25th for production of the source code that Ford

13   has indicated it would produce with respect to the two

14   specific codes, the PFDIM and F_HLD.

15          I understand that the parties need to meet and

16   confer about the protocols for that to be accomplished, and

17   I instruct the parties to do that immediately after this

18   call is concluded today.  And I leave it to the parties

19   whether or not to adjust out that date, September 25th, by a

20   few days in order to accommodate whatever protocols are

21   agreed to by the parties, if needed.

22          And I'll instruct Ford to be prepared to produce

23   the manifest of source code for the source code it's

24   producing.  I'm going to deny any requests that would

25   require Ford to produce a manifest for these systems in the

1    entire vehicle trunk to hood, tires to roof.  I can't see

2    how that's proportional and relevant to the discrete

3    engine-related issues that we're discussing with respect to

4    this case, but I am no automotive engineer, so that is

5    without prejudice.

6           And I think the portions of the manifest that

7    would be most helpful to a meaningful review and

8    understanding of the source code that will be produced, I

9    think the parties are capable of discerning that.  And if

10   there's any issue over the scope of that, then certainly you

11   can come back to the Court promptly prior to any source code

12   review, if that's what it takes.

13          But just to make sure everyone's aware of where

14   the Court stands, I'm not requiring a manifest of source

15   code for systems in the vehicle in totality.  I think the

16   parties have to do their best to be proportional in this

17   case.  And I suppose that is asking the plaintiffs to make

18   sure that they are being specific and proportional as to

19   what they're looking for.  I want the source code review to

20   be a meaningful exercise, certainly for the plaintiffs, but

21   I also want it to be proportional for the defendants.

22          With that, are there any other issues remaining?

23   By my checklist, I think we've covered all of plaintiffs'

24   issues.  But if I'm missing anything, Mr. O'Connell, please

25   flag it.

1            MR. O'CONNELL:  That's correct, Your Honor.

2       Those are the issues that we've raised in our briefs.

3            THE COURT:  All right.  I'm now ready to turn to

4       Ford's issues.  Just give me a moment to pull those briefs

5       in front of me.  I have Document Numbers 55, which is Ford's

6       moving submission, and plaintiffs' response at 56.  I now

7       have those in front of me, and I'll turn it over to counsel

8       for Ford who will take the lead on these arguments.

9            But I guess I want to start with just a

10      cautionary preliminary statement that much of this seems

11      like a do-over from our previous discussion, and I'm not a

12      fan of do-overs.  If there's new information that would be

13      persuasive for the Court to change its positions on rulings

14      related to these issues that I made previously, I'm open

15      certainly to hearing it.  But if this is just an effort to

16      have a second bite or a do-over, I am not persuaded to

17      change my views.

18           So with that in mind, I'll hear from Ford.

19           MS. CLAYTON:  Thank you, Your Honor.  This is

20      Natalie Clayton for Ford.  We appreciate what Your Honor

21      just said, and there were two main issues that arose at the

22      last hearing that we thought would provide the Court with

23      the benefit of a more fulsome record.

24           The first was the case law with regard to

25      priority.  Plaintiffs had said that as sort of a matter of

1   right, they are automatically entitled to their priority

2   date.  And as a result, none of the documents that Ford was

3   seeking post-2004 from the Bobcat project could possibly be

4   relevant.

5          And you know, Your Honor, we believe that that

6   was a misstatement of the law.  And so our letter, in part,

7   goes to demonstrating that the Federal Circuit has concluded

8   on numerous occasions that priority is something that they

9   are not entitled to as a matter of right, and that, indeed,

10  it can and successfully is challenged quite often.  And so

11  our letter tried to provide the Court with some more context

12  and case law from the Federal Circuit on that point.

13         The second issue that we tried to highlight that

14  Ford has discovered, now that it has had more opportunity to

15  look at the documents that Ford has in its possession, is

16  that in addition to being relevant to the priority issue and

17  when the inventions here were conceived up and reduced to

18  practice, it became clear to us in looking at Ford's

19  production and documents that, you know, we recently

20  provided to plaintiffs that Ford, indeed, has an argument

21  that it is a part or entire owner of this invention by

22  virtue of certain license agreements between the parties,

23  both in the memorandum of understanding and the agreement

24  that the parties entered into as a result of the project and

25  with the Department of Energy.

1        And looking at Ford's production, we started to

2    see evidence of the fact that Ford is the one who came up

3    with the inventions that are now claimed in the

4    patents-in-suit as part of the Bobcat project.  And we have

5    attached some of those documents to our filing for the

6    Court.

7        And the agreements say, at least our

8    interpretation of the agreements say that if that is the

9    case, then Ford is minimally a part owner with the

10   royalty-free license or perhaps the entire owner of the

11   rights to these patents.  And so Your Honor had said that on

12   a more fulsome record, she would take another look at the

13   issue if we brought it to the Court's attention.  And so

14   with this more fulsome case law record and factual record,

15   we wanted to bring the issue to the Court again.

16       The other thing that had become clear to us as

17   we thought about the issues more is that from plaintiffs'

18   response, it's clear that their entire defense to not

19   wanting to produce these documents is that they believe that

20   we have to prove our case at the outset with regard to

21   priority and licensing rights in order for them to get

22   discovery.  And that simply isn't how litigation is

23   conducted.

24       We are entitled to discovery in order to try to

25   prove the theory that we have in the case.  And it's the

1   real practicality of the fact that if the Court ultimately

2   determines that they do not have priority to the 2004

3   application, if that is the case, then what will end up

4   happening is that Ford will then be required to request that

5   discovery be reopened in order to investigate and obtain

6   discovery on its defense since it is the proper owner or

7   co-owner of this technology as a result of the agreements

8   and the development work that's attached to the Bobcat

9   project.

10          And so, Your Honor, we do believe that we have a

11  more fully developed record that we have presented in these

12  papers and that the case law supports that these documents

13  could go to the priority argument.  And so we believe that

14  the documents relate to conception and reduction to practice

15  which is not subject to the Court's six-year rule.

16          And alternatively, that even if they don't

17  relate to conception and reduction to practice, good cause

18  exists given the further record that Ford has presented in

19  these letters.

20          THE COURT:  All right.  I will hear from

21  plaintiffs.

22          MR. HEALY:  Thank you, Your Honor.  This is

23  Andres Healy of Susman Godfrey.  In considering and

24  rejecting Ford's same request only a few weeks ago, this

25  Court made two things abundantly clear.

1          Number one, it made clear that it was Ford's

2    burden to show not just relevance, but good cause to Ford's

3    plaintiffs to undertake to produce discovery from this

4    period which started, you know, more than a decade ago, and

5    it ran for a course of years.

6          And number two, the Court made very clear that

7    it did not intend to casually set aside the six-year

8    discovery limitation, but rather to justify the Court doing

9    that, that Ford was going to have to come forward with

10   convincing evidence to meet its burden.  And quite simply,

11   as this Court stated before, it hasn't done so.

12         I apologize.  The sum and substance of Ford's

13   argument is simply a repeat and a rehash of what it argued

14   the last time.

15         Number one, Ford repeats its argument that the

16   Bobcat document somehow will show that the plaintiffs'

17   patents are not entitled to their 2004 priority date because

18   they were confirmed -- and this is a direct quote, and I

19   think the sum and substance of Ford's argument from Page 3,

20   "that EBS and Ford jointly came up with the single fuel

21   injection technology."

22         And we have always understood Ford's argument to

23   be that somehow my client and the inventors did not conceive

24   of using gasoline as a direct injection fuel source, and

25   that's borne out by what Ford wrote in their letter.  And as

1    we argued the last time and as this Court agreed, as a

2    matter of law, that argument fails.

3              And why is that?  Because as this Court pointed

4    out at the last hearing, whether a patent is entitled to its

5    priority date, it is determined by looking at the patent

6    itself by "a comparison of the patents-in-suit to the

7    original application."  That's borne out by the Federal

8    Circuit LizardTech decision stating that you look to either

9    the claims or the specification of the original application.

10             It's borne out by the Akamai decision we cited

11   which held that what a patent understands or intends the

12   claims to mean is irrelevant to its objective meaning and

13   scope.  And it's not surprising that Ford did not cite a

14   single case that looked to extrinsic evidence to determine

15   whether a continuation patent -- and that's an important

16   distinction because the bulk of the case law that Ford cites

17   is detailed and relates to a continuation in part which,

18   obviously, has a different additional material in its

19   specification, and that's why this question arises.

20             But none of the patents or none of the cases

21   that Ford cites even look to extrinsic evidence.  In fact,

22   to the contrary and contrary to Ford's characterization, the

23   Vas-Cath decision that they cite specifically states, "The

24   test for sufficiency of the Court in a parent application is

25   whether the disclosure of the application relied upon

1    reasonably conveys the artisan that the inventor has

2    possession at that time of the later claimed subject

3    matter."

4              So again, if you look to the patent, if you look

5    to the application, the specification and the claims, not

6    extrinsic evidence.  And in fact, in the Board of Trustees'

7    decision that Ford cites in its brief, the Federal Circuit

8    actually held that the board had erred in relying on

9    portions of an expert's testimony that relied on certain

10   extrinsic evidence.

11             So simply put, the Federal Circuit has held that

12   extrinsic evidence like the Bobcat evidence is entirely

13   legally irrelevant, the priority issue that Ford is relying

14   on to, nevertheless, argue that good cause exists here.

15             And I do want to briefly respond.  Ford has made

16   a few points talking about the legal standards, and I think

17   attempting to argue that we had misrepresented what those

18   are.  We disagree, absolutely.  We've cited in our brief a

19   decision out of the Eastern District of Texas that says,

20   "Defendant must inevitably convince the Court by clear and

21   convincing evidence that plaintiff is not entitled to the

22   earlier filing date because the written description of the

23   earlier application does not support the '678 patent claim."

24             Judge Andrews in the Endo decision that we cited

25   in our brief reached the same result basically concluding or

1    expressly concluding that the defendants' argument that the

2    patentee holding a continuation patent, again a distinction

3    from a continuation in part, which is the case law that Ford

4    cites, that it was simply incorrect for defendants to argue

5    that there wasn't a presumption of priority, and that it

6    wasn't their burden to disprove or break that chain.

7            And I think it's important here, even setting

8    aside the fact that, as a matter of law, Ford's arguments as

9    to why the Bobcat evidence is relevant simply just don't

10   follow.  The facts here are clear that the actual relevant

11   evidence, the parent's application, which Ford has never

12   disputed as an accurate copy.  We submitted it as Exhibit B

13   to our opposition letter.  You know, even Ford now admits

14   that it must, because the Court, you know, pointed it out at

15   the last hearing, state specifically in the specification,

16   expressly contemplates -- this is November of 2004 -- again,

17   no dispute as to that date -- years prior to the Bobcat

18   project even being conceived -- the 2004 application

19   expressly states and contemplates "the use of direct

20   injection of gasoline."  That's at Page 5 of Exhibit B.

21           And to be very clear, that's not all it says.

22   The very next page which Ford never mentioned, or discusses,

23   or discloses to the Court, but the very next page, it states

24   again, "direct injection of gasoline results in

25   approximately a five octane number decrease in the octane

1    number required by the engine."  So the core point of Ford's

2    motion which is repeated is that "this evidence" -- I

3    apologize.  That it may show "EBS and Ford jointly came up

4    with the single fuel direct injection technology."

5              That's what Ford says is at issue.  And the 2004

6    patent application, years prior to Bobcat even existing,

7    irrefutably demonstrates that that's not the case.  We even

8    point out in the original claims of that application, again

9    filed 2004, years prior to Bobcat, specifically, and

10   directly, and expressly claim the use of gasoline as a

11   direct injection fuel source.

12             So our point, frankly, as to this justification

13   as to why these documents are relevant is that, number one,

14   legally they're not.  The Federal Circuit and this court

15   made that clear.

16             And number two, it's further refuted by the

17   fact, by the irrefutable demonstration that the original

18   patent application which predates the Bobcat project by

19   years, demonstrates that my clients had invented this

20   technology and had conceived of this technology years before

21   Bobcat was even considered.  And that falls into Ford's

22   second justification, this argument that somehow as a result

23   of agreement and memorandum of understanding entered into

24   years later that Ford somehow obtained rights to obtain my

25   client's patents.

```
1            And again, Ford's own documents squarely refute

2   that position.  Both of the agreements expressly say that

3   it's only, at a minimum, technology that is jointly

4   developed to which Ford would obtain any rights.  Again, the

5   2004 application demonstrates that my clients had the

6   technology at issue years prior.

7            As I say, as a preliminary matter, Ford has

8   never explained how agreements between EBS and Ford would

9   give Ford rights to MIT's patent.  But even setting that

10  aside, again we have the irrefutable proof of the 2004

11  patent application.

12           And then even further than that, the 2006 end

13  review, this is language that we quoted in our letter to

14  this Court, but it makes very clear specifically that

15  neither party would get any rights on any patents that "were

16  based upon patent applications of one of the parties before

17  the effective date in coming into legal force after the

18  effective date."  That's exactly our scenario.

19           And then it even goes further.  It says that

20  neither party would get rights of any patents that are

21  "based on MIT patent applications before the effective date

22  which are licensed by EBS and coming into legal force after

23  the effective date."  Again, it's exactly the scenario, and

24  Ford offered no justification for how it can, nevertheless,

25  obtain rights in our patents, Your Honor.
```

1          And with respect to Ford's third justification

2     of estoppel argument, I didn't hear counsel reference that,

3     and I'm happy to not address it, unless the Court has a

4     preference.   I'd simply state that Ford has presented no new

5     evidence, no new case law, nothing other than, I think,

6     conceding that it was reiterating its argument.   And we

7     believe that the Court has already resolved that argument

8     and that its resolution should remain the same.

9          THE COURT:   Before I hear from Ms. Clayton, I do

10    have a question for you, Mr. Healy, if you're in a position

11    to answer it.   What have plaintiffs produced thus far in

12    discovery related to whether the inventors conceived of the

13    inventions in the patents or reduced them to practice?   To

14    what extent has there been document production on those

15    issues?

16         MR. HEALY:   Absolutely, Your Honor.   So we have

17    agreed to produce, and my understanding is we have produced.

18    Mr. O'Connell can correct me if I'm wrong, but that we have

19    produced certainly the file histories.   We've produced any

20    conception or reduction to practice documents, including

21    anything predating the 2004 applications.   For example, lab

22    notebooks or information disclosure statements, to the

23    extent that they exist, all have been collected and

24    produced.

25         And we have told Ford that we will produce

1    identical documentation throughout the time period, so

2    before 2004, frankly, to the extent that it exists for all

3    of the patents at issue in the asserted patents.

4                   I hope that answers your question.

5                   THE COURT:  Okay.  It does.

6                   I'll hear back from Ms. Clayton now.

7                   MS. CLAYTON:  Thank you, Your Honor.  You know,

8    plaintiffs' first argument was that the Federal Circuit has

9    determined that extrinsic evidence can never be relevant to

10   the priority analysis, and that none of the cases that we

11   cite support anything other than that.  And that's just,

12   frankly, untrue.

13                   If you look at the Nuvo Farms decision that we

14   cited from the Federal Circuit and look at Pages 26 to 27 of

15   the decision with the Lexus cite, the Federal Circuit

16   actually pointed to testimony from the inventor about

17   whether or not he was in possession of the invention at the

18   time.  And in fact, the Federal Circuit concluded, and I

19   quote, "Although inventor testimony cannot establish written

20   description support where none exists in the four corners of

21   the specification, it illuminates the absence of critical

22   description in this case."

23                   And that's exactly what we believe that the

24   Bobcat documents will do here, Your Honor.  They will

25   illuminate the fact that the invention that they set forth

1    in their 2004 application was very different from the

2    invention that they ultimately claimed in 2011 with the

3    patents that are at issue in this lawsuit.

4           And so it's simply incorrect that extrinsic

5    evidence can never be relevant to the priority and written

6    description analysis.  In fact, the Federal Circuit, you

7    know, has looked to such evidence in particular when

8    determining that written description support is not

9    available.

10          The next argument that plaintiffs presented was

11   with regard to the burden of proof, but again, Your Honor,

12   that's putting the cart before the horse.  Whether or not we

13   have the ultimate burden of proof when it comes to the

14   ultimate issue of whether or not there is priority is

15   irrelevant to the issue of whether or not we're entitled to

16   discovery on that issue.  That would be like saying, oh, we

17   were never entitled to jurisdictional discovery simply

18   because, you know, they say that jurisdiction is not proper

19   in this case.

20          We are entitled to discovery on both the issue

21   of the priority date and the issue of whether or not the

22   Ford employees contributed to the invention that was filed

23   in 2011 in order to try to prove and meet our burden of

24   proof with regard to the legal issues in this case.  And so

25   putting the cart before the horse is not what the federal

1    rules contemplate or the case law contemplates in terms of

2    how discovery is supposed to operate.

3            The third point is that, again, seeking to try

4    to prove the ultimate issue at this stage of the case, we

5    heard plaintiff talk about the specification that was filed

6    back in 2004.  And while I don't think, you know, this issue

7    should be litigated in the discovery portion of the case,

8    what I would like to point out is that plaintiffs very

9    selectively quote from the specification.  And what they

10   fail to point out to the Court is that the first line on

11   Page 5, it says, "It is also possible to use direct

12   injection of gasoline as well as direct injection of

13   ethanol."  In other words, this contemplates directly

14   injecting both of those things, ethanol plus gasoline.

15           Here, the inventions that they have tried to

16   patent and have sued Ford on cover using just gasoline.

17   That's what they're claiming.  So it's much broader and

18   different than that disclosure on Page 5.

19           As for the next disclosure they point to, if you

20   read that entire section, what it is doing is telling you

21   that directly injecting gasoline does not give you the same

22   benefit as directly injecting ethanol and is using the

23   gasoline example to contrast and show how much better it is

24   to directly inject ethanol.

25           And so while I think it's improper at this stage

1    to litigate whether or not they're entitled to priority, the

2    evidence that plaintiffs point to falls short.  And at a

3    minimum, they show that we have very different views, both

4    on the priority argument and who is correct, and also on the

5    licensing argument and who is correct there.

6              And because there is a clear dispute between the

7    parties as to who is correct on these issues, the parties

8    should be entitled to fulsome discovery on these issues so

9    they can ultimately prove their case.

10             And finally, the argument that the documents

11   related to Bobcat can't relate to our licensing defense,

12   again, it's predicated on the notion that they win on their

13   2004 priority date argument.  If they don't ultimately win

14   on that issue, those documents go squarely to who actually

15   invented what was filed in 2011 and whether or not Ford has

16   a right to those inventions.

17             And so at this stage, we believe the proper

18   course is to allow that discovery, allow a fulsome record to

19   be determined, and ultimately the Court or the jury will

20   decide the issue, but Ford is entitled to discovery in order

21   to make its case here, Your Honor.

22             THE COURT:  All right.  This issue was heard at

23   the last hearing, and I have not found that the good cause

24   standard has been met under Paragraph 4E of the default

25   standard to go back beyond six years before filing the

1   complaint to require production of the Bobcat documents.   So

2   I'm denying the request.

3                    And as I stated in the last hearing,

4   Paragraph 4E of the default standard provides that absent a

5   showing of good cause, follow-up discovery shall be limited

6   to a term of six years before the filing of the complaint,

7   except that discovery related to asserted prior art or the

8   conception and reduction to practice of the inventions

9   claimed in any patent-in-suit shall not be so limited.

10                    And let me just say a couple of things to

11  clarify this record.   I understand Ford's arguments with

12  respect to a priority date challenge.   And to the extent I

13  indicated generally that priority date challenges are built

14  around a written description inquiry, and that inquiry is

15  based generally upon a comparison of the patents-in-suit

16  and, in this instance, the 2004 application to which they

17  claim priority.

18                    But in no way should that comment be taken as a

19  ruling as a matter of law.   I am addressing discovery

20  disputes, and I only look at the general law surrounding

21  priority date challenges to guide me with respect as to

22  whether or not to permit discovery of extrinsic evidence in

23  this case.   And I look at that under a standard of Rule 26

24  relevance and proportionality, and in the context of Rule 4e

25  of our default standard which requires a showing of good

1    cause.

2              And I assess all of that, and I assess the

3    record that's made and put before me allegedly to justify

4    the good cause or to establish the good cause requirement

5    has been satisfied.  And I take that into consideration in

6    making my rulings.

7              This is in no way to be interpreted that the

8    plaintiffs have established a 2004 priority date as a matter

9    of law or as a ruling that the Court as a matter of law

10   should not consider extrinsic evidence when considering

11   arguments about that priority date challenge or a ruling as

12   a matter of law as to the proper construction of any

13   agreements between EBS and Ford including not limited to the

14   memorandum of understanding.

15             All of those issues are on the plate of the

16   district judge.  They're not my dispositive issues.  I

17   haven't been referred those dispositive issues.  I've been

18   referred discovery.  I only look at the law to put things in

19   context as to what I should consider relevant and

20   proportional to the needs of the case.

21             And I'm just saying, that in this instance on

22   this record and on the record made before me, I'm not

23   satisfied that there's good cause to start requiring

24   production of extrinsic evidence with respect to this Bobcat

25   project.  There may come a time where a deposition or some

1      other documentary discovery reveals that we should delve a

2      little bit further into that and go beyond the limits set in

3      the default standard, but I don't find that we're there yet.

4              So please be clear on the nature of my rulings.

5      Don't be arguing in future dispositive motions to Judge

6      Connolly that I've made any findings as a matter of law.

7      All I've done is tried to assess what discovery may be

8      relevant and proportional to the needs of the case under

9      Rule 26.

10             So obviously my ruling is without prejudice.

11     And similarly, I find nothing different on the record with

12     respect to the estoppel arguments that would convince the

13     Court to allow Ford to have discovery on estoppel beyond the

14     six-year limit in the default standard based on what I've

15     read in the papers.  And Ford hasn't really pressed for that

16     on the call today, although it did raise the issue again in

17     its briefing.

18             So I will stand on these rulings.  If Ford

19     should find that there are deficiencies in the production of

20     discovery with respect to conception and reduction to

21     practice, Ford is free to bring those to the attention of

22     the Court in the future.  And as I said earlier, if other

23     discovery along the way raises the issue of the relevance of

24     the Bobcat project documents, Ford is free to revisit that

25     issue with the Court at a future time.

```
 1              So with that, I think that concludes all of the

 2   issues that were put before the Court today.  My rulings, as

 3   I said earlier, are governed by Rule 72(a).

 4              Are there any further issues from Ford that I

 5   haven't addressed?

 6              MS. CLAYTON:  No, Your Honor.  You've addressed

 7   all the issues for Ford.

 8              THE COURT:  Okay.  Any further issues from the

 9   plaintiffs?

10              MR. O'CONNELL:  No, Your Honor.  Thank you very

11   much.

12              THE COURT:  Thank you.  That concludes our

13   teleconference.  I'm disconnecting, counsel.  Have a good

14   day.

15              (Everyone said, Thank you, Your Honor.)

16              (Teleconference was concluded at 3:00 p.m.)

17              I hereby certify the foregoing is a true and

18   accurate transcript from my stenographic notes in the

19   proceeding.

20                        /s/ Heather M. Triozzi
                          Official Merit Reporter
21                        U.S. District Court

22

23

24

25
```